UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Mary Pippin,<br>    *Plaintiff*,<br><br>    *v.*<br><br>Town of Vernon,<br>    *Defendant.* | Civil No. 3:08cv121 (JBA)<br><br><br><br>September 21, 2009 |

ORDER AND RULING ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT [Doc. # 22]

Plaintiff Mary Pippin, formerly the Acting Director of the Data Processing Department of the Town of Vernon (the "Town"), brings suit against the Town, alleging that in failing to promote her to be the Director of the Data Processing Department, the Town discriminated against her on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* For the reasons that follow, the Town's motion for summary judgment will be granted.

I.  Background

Ms. Pippin began working for the Town's Data Processing Department in 1991 as a system operator, and was later promoted to systems analyst. (Pippin Dep. at 13:16–22, 15:6–13.[1]) In April 2006, the department's Director, Scott Scofield, became ill and soon was unable to work full-time. In accordance with Mr. Scofield's apparent wishes and direction, Ms. Pippin began performing the Director's duties when Mr. Scofield was out of the office.

---

[1] Portions of Ms. Pippin's deposition transcript are attached to each of the parties' briefs. The Court references the deposition as a single document, drawing from the pages provided by each party as necessary.

(Pippin Dep. at 22:5–23, 25:4–27:23, 29:4–22.)  Pursuant to the union contract under which Ms. Pippin was employed, the Town Administrator, Christopher Clark, paid her the director's salary, prorated to the amount of time she spent performing the director's duties. (*See* Ex. C.[2])  By late January 2007, Mr. Scofield could no longer work at all, and on February 1, 2007 the Town Administrator, Christopher Clark, "change[d] [Ms. Pippin] to the position of Director of Data Processing" and provided her with the director's salary, in accordance with the section of the Town's Personnel Rules and Regulations governing "temporary assignment[s]."  (Ex. F; *see* Ex. G at § 5.3.c.2.)  Four days later, after Mr. Scofield died, Mr. Clark amended his appointment to appoint her the "Acting Director of Data Processing" in accordance with the same provisions of the union contract and Town personnel rules, and specified that "[t]his change will be in effect until at such time a permanent replacement is found."  (Ex. H.)  Mr. Clark then discussed the vacancy created by Mr. Scofield's death with both Ms. Pippin and the only other systems analyst, Ernest DuPont, and encouraged Ms. Pippin to apply to be Director.  Because the Town Charter specifies that the Data Processing Director is a "Qualified Officer Outside the Classified Service," an applicant must take a "competitive examination[]" before he or she may be appointed, and is appointed by the Town Council upon recommendation by the Mayor.  (Ex. J at Ch. XI, § 3(a).)

---

[2] Unless otherwise stated, exhibits cited are attached to Defendant's Memorandum in Support of Summary Judgment [Doc. # 23].

After learning that Ms. Pippin was interested in applying to be Director, Mr. Clark and the Town's Human Resources Director, Daniel Sullivan, recommended to then-Mayor Ellen Marmer that the Town hold an open competitive examination rather than an internal promotional examination, in order to "generate competition for the position" and "ensure a proper pool of candidates." (Sullivan Aff., Ex. B, at ¶ 13; Clark Aff., Ex. D, at ¶¶ 21, 22.) Dr. Marmer agreed (Marmer Aff., Ex I, at ¶ 18), and on February 24, 2007, Mr. Clark approved and published a job announcement requiring response by March 19, 2007 and listing the following qualifications: "BS Degree in Information Technology, or a related field, and five years of progressively responsible experience in information technology . . . including three years of supervisory experience of an operational unit, or an equivalent combination of education and experience," and stating a "prefer[ence]" for "[a] Master of Science degree" (Ex. K; *see also* Sullivan Aff. at ¶ 14; Clark Aff. at ¶ 24).

Under the Town Charter, the Director of Data Processing was to be appointed in the following manner: "subject to approval of a majority of the Town Council, the Mayor shall appoint [the Director] from a list of the top three candidates per position chosen exclusively on the basis of technical and administrative qualifications, character, education, training and experience as determined by competitive examinations[.]" (Ex. J at Ch. XI, § 3(b).) The Town's Personnel Rules and Regulations further specified that "[c]ompetitive [e]xaminations . . . may be assembled or unassembled and may include written, oral, physical, psychological or performance test or any combination of these," and grant to the

3

Town Administrator discretion over both how to assign weight to each factor, and the appointment of an "advisory committee or examining committee." (Ex. G at § 8.2.A.) Having determined to hold an "oral examination" (i.e., an interview), Mr. Clark discussed the composition of the interview panel with Dr. Marmer and Mr. Sullivan. Because she was planning to have a member of the Town's Board of Education with her when she interviewed the candidates recommended to her, Dr. Marmer discouraged Mr. Clark from appointing a member of the Board of Education to the interview panel. (Marmer Aff. at ¶ 19.) Mr. Clark appointed an interview panel of three people: himself, Mr. Sullivan, and James Luddecke, the Town's Finance Officer and Head of the Finance Department. (Clark Aff. at ¶¶ 25–28; Sullivan Aff. at ¶ 17; Luddecke Aff., Ex. L, at ¶ 5). Mr. Sullivan then constructed a "standardized" list of interview questions covering personal, technical, managerial, and behavioral issues after collecting suggestions from each panel member as well as Barry Grant, an IT consultant to the Vernon Public Schools. (Ex. Q (final questions); Ex. N (questions suggested by Mr. Clark); Ex. O (questions suggested by Mr. Luddecke); Ex. P (questions suggested by Mr. Grant); Sullivan Aff. at ¶¶ 22–25.) The last of the 29 questions asked was whether the applicant "ha[d] any questions for [the panel]." (Ex. Q at 3.)

Twenty people applied to be Director, and the panel members selected seven people for interviews, including Ms. Pippin. (*See* Email from Mr. Clark dated March 26, 2007, Ex. M.) After one withdrew, the panel scheduled interviews for the six remaining applicants for April 4, 2007. Among them were Ms. Pippin, Arthur Beirn, George Pillar III, and Helmut

4

Hanelt. According to their applications and resumes, each applicant had the following qualifications:

¶ Mr. Beirn had an MBA and a bachelors degree in industrial psychology and engineering. He was a full-time consultant for application development to the Town of Manchester, where he held "[t]own-wide responsibility to develop strategic direction and standards for eGov/eCommerce," "[a]chieve[d] interoperability between disparate town systems," worked on "Regional Sharing Systems," "[s]erved as Director of the CRCOG Public Safety Consortium for Computer Aided Dispatch systems," and worked with the town "while architecting optical fiber infrastructures." He also had served for four years as an Assistant Professor at Central Connecticut State University, where he "[d]eveloped eBusiness/eCommerce curricula" and "[t]aught undergraduate and graduate level courses." And for almost ten years he was the president of a small IT consulting business that performed "projects for large Fortune 500 companies." His resume also listed a number of technical qualifications. (Beirn Employment Application, Ex. S.)

¶ Mr. Hanelt had a bachelors degree in mathematics. For 23 years he was the manager for enterprise application services at a private company, where he "[m]anage[d] ebusiness IT services[,] daily operations, new business integrations, [and] application development; f[ou]nd IT solutions for business departments"; and served as "IT liaison to different business companies." Before that he was the project leader for "CICS systems" at a utility company, where he "[m]aintain[ed] CICS environment for all business lines," and

for five and a half years before that he was a "Senior Systems Programmer" for a private bank, where he did "[a]pplication development," "maintain[ed] mainframe operating systems," and "[b]uilt online CICS infrastructure." (Hanelt Employment Application, Ex. T.)

¶ Mr. Pillar holds an "ASDP" (which appears to be some form of associate's degree), a bachelor's degree in computer science, and a master's in computer science. He served for eight years as "MIS Director" for a wholesale distribution company, where he was "[r]esponsible for all aspects of the business regarding technology including supervising . . . telephone and camera systems, [v]ideo systems, wireless, bar code scanners, windows serves, web site, email and IBM AS400 system." Before that, for two years he was "I/T Manager" for a manufacturing company, where he was "[r]esponsible for all company computer systems and server room[s]," and for the ten years before that he was the "Computer Systems Supervisor" for the City of New London, where he was "[r]esponsible for all City departments['] computer system needs." (Pillar Employment Application, Ex. U.)

¶ Ms. Pippin holds an associate's degree and bachelors degree in business administration and in 2005 obtained a master's in information technology and communication. As described above, at the time she applied to be Director she had for eight months served as the Town's Acting Director of Data Processing, and for 15 years before that was an IT analyst in the Data Processing Department. Among other tasks, she "[s]upervise[d] employees and prioritize[d] network and infrastructure enhancements as

new technologies emerge[d]" and "[p]rovide[d] and maintain[ed] support for all municipal[-]owned software and hardware throughout the [T]own and school departments." (Pippin Employment Application, Ex. V; *see also* Pippin Dep. at 31:8–24.)

At the beginning of each interview the panel offered to introduce each panel member and explain the Town governance structure and duties and responsibilities of the Director of Data Processing. (*E.g.*, Sullivan Aff. at ¶ 25.) Ms. Pippin declined to hear these introductions and explanations, and had no questions for the panel. (Pippin Dep. at 58:2–12; Sullivan Aff. at ¶ 27.) Mr. Sullivan avers that Ms. Pippin "was asked each of the standardized questions," that "she was not rushed through her answers," and that "[s]he was given an equal opportunity to answer each question as all of the other applicants." (Sullivan Aff. at ¶ 28; *see also* Clark Aff. at ¶ 37; Luddecke Aff. at ¶ 16.) Ms. Pippin, by contrast, testified that she interviewed towards the end of the day and felt rushed because she knew that the panel members were to attend a budget meeting later that evening, and "Mr. Clark kept looking at his watch." (Pippin Dep. at 58:4–19.) Ms. Pippin was not the last applicant the panel interviewed. (*Id.* at 58:13–15.)

"Immediately following the conclusion of the oral examinations," the panel "met to determine the certification list" for Dr. Marmer's consideration. (Sullivan Aff. at ¶ 29; Clark Aff. at ¶ 39; *see also* Luddecke Aff. at ¶ 17.) Each panel member was impressed with Arthur Beirn and Helmut Hanelt—the two men the panel co-ranked as the top candidates—as well

7

as their third choice, George Pillar, and each panel member was unimpressed with Ms. Pippin.[3]  Mr. Sullivan avers:

> I was particularly interested in those candidates wh[o] expressed an eye to the future.  I did not believe that the Director of Data Processing should just be a placeholder and would need to have an idea of evolving technology and be able to express a vision of how such evolving technology and the information technology field itself would impact the Town of Vernon.  I also believed that the Director of Data Processing would have to have the ability to lead and manage the department.  I was not looking for a director simply to be a place-holder.
>
> Mr. Beirn, Mr. Hanelt and Mr. Pillar not only had much more extensive information technology experience than Mrs. Pippin, they each had more extensive management experience.  They were all able to express themselves in a much broader scope [than] Mrs. Pippin.  Mrs. Pippin's responses during the oral examination focused more on what the Data Processing Department was presently doing.  In my opinion, her responses demonstrated a lack of vision.

(Sullivan Aff. at ¶¶ 30, 32.)  Similarly, Mr. Clark avers:

> Personally, I had a fairly good sense of what I was looking for to create with the Data Processing Department.  In my previous position with the Town of Wellesley as the Deputy Director of Government Services, I worked closely with the Network and Information Systems Director and his department.  I thought it provided a good model for what I would like to create with the Town of Vernon's Data Processing Department.  Particularly, the Director of the Department would need managerial vision to help lead and develop the department.  Of particular interest to me would be an individual who not only paid attention to the new technologies but embraced them.  I viewed new technologies as a means to help productivity in other departments to make up for the lack of personnel constrained by budgetary pressures.  I believed that the Director would have to be a persuasive public speaker, particularly on budgetary matters, to convince the Town Council to make the

---

[3] Ms. Pippin testified at her deposition that although she asserted that she is "better qualified than the other individual [who] was granted a second interview" (*i.e.*, Mr. Hanelt), she did not know his name, "education," or "work experience."  (Pippin Dep. at 96:4–15.)

necessary investments in the Data Processing Department. This was of particularly importance to me given that the previous Director had left a position in the Department unoccupied for approximately one and a half years such that the Town Council cut the salary for such position. Essentially, I believe that the Director would need to raise the credibility of the Department before the Town Council.

Mrs. Pippin performed poorly during the oral examination, particularly on questions concerning the future technology as well as the questions directed towards management and leadership. She had "deer-in-the-headlights" when asked and did not articulate much in response to such questions.

[By contrast, Messrs. Beirn and Hanelt] [b]oth had extensive management experience in the field, Mr. Beirn with his own business and Mr. Hanelt with a major corporation. Both appeared to possess the technical capabilities for the position. Both were able to articulate intelligent responses to the oral examination questions. Based upon their oral examinations, both appear[ed] [to] possess the personality and communication skills that would be necessary to interact with the Town Council and lead a department.

I was particularly impressed with the questions Mr. Beirn had of us during the oral examination as they demonstrate that he had given considerable thought to the challenges that the Director of Data Processing, the Data Processing Department as well as the Town of Vernon would face in the coming years.

We ranked George Pillar III next on the certification list. He had over 10 years of experience in private industry as a Management Information Services Director and Information Technology Manager, including supervision of other employees. Prior to such time, he had nine years of experience as a Computer Systems Analyst for the City of New London. Additionally, he also served as an Information Consultant for the previous 20 years and as an adjunct faculty member for the previous 10 years at Manchester Community College and the University of New Haven.

We ranked Mrs. Pippin below Mr. Pillar. She had less experience in the field than Mr. Beirn, Mr. Hanelt and Mr. Pillar. Also, she had less managerial experience. Frankly, she performed very poorly during her oral examination. Based upon her oral examination, she appeared to lack the skills I believed necessary effective lead the Data Processing Department into the future. We

9

>   all agreed that Mrs. Pippin lacked the leadership and managerial experience and skills demonstrated by Mr. Beirn, Mr. Hanelt, and Mr. Pillar.

(Clark Aff. at ¶¶ 29, 38–43.)  Finally, Mr. Luddecke avers:

>   We all agreed that two candidates, Arthur Beirn and Helmut Hanelt, were the two best candidates based upon their applications and oral examinations.
>
>   While all the applicants appeared to have the technical background for the position of Director of Data Processing, we were also looking for leadership and managerial capabilities and experience.
>
>   Both Mr. Beirn and Mr. Hanelt gave excellent responses during the oral examination on questions aimed at the leadership and managerial qualifications.  Mr. Beirn even submitted written questions which demonstrated his understanding of the issues that the Director of Data Processing, the Data Processing Department and the Town of Vernon would face in the future.
>
>   Mr. Clark, Mr. Sullivan and myself all agreed that Mrs. Pippin, ranked 3, was not as strong a candidate, most notably on those questions during the oral examination concerning leadership and management, as Mr. Beirn, Mr. Hanelt and also George Pillar, the individual we ranked 2.  Furthermore, Mrs. Pippin lacked the management experience of Mr. Beirn and Mr. Hanelt.  Mr. Beirn had run his own company for eight years with numerous employees reporting directly to him.  He also had been employed as an Assistant Professor at Central Connecticut State University in the e-Business Department.  He had been a consultant and an employee for the Town of Manchester and had been responsible for supervising several employees on numerous projects.  Mr. Hanelt had been employed for the previous 23 years in the management of ebusiness information technology services for a global Fortune 300 company.
>
>   Both Mr. Beirn and Mr. Hanelt performed very well during oral examination.  Mr. Beirn's written questions demonstrated that he had put a tremendous amount of effort and thought into the managerial aspects of the position and long-term planning.
>
>   Mrs. Pippin had less experience in the field and less managerial experience . . . than Mr. Beirn, Mr. Hanelt and Mr. Pillar.  Overall, Mrs. Pippin did not perform nearly as well on the oral examination as Mr. Beirn, Mr. Hanelt and Mr. Pillar.

10

(Luddecke Aff. at ¶¶ 18–23.)  Following discussion among Messrs. Clark, Sullivan and Luddecke, the panel ranked the following four applicants as follows:

| Rating | Name | [Town of Residence] |
|---|---|---|
| 1. | Arthur Beirn | Vernon |
| 1a. | Helmut Hanelt | South Glastonbury |
| 2. | George Pillar | Bozrah |
| 3. | Mary Pippin | Tolland |

(Certification List, Ex. R.)  The panel ranked Mr. Beirn "1" and Mr. Hanelt "1a" because Dr. Marmer indicated that she would personally interview only the top-ranked candidate and decide whether to offer him the position, and because "Mr. Beirn and [Mr.] Hanelt were the strongest candidates" and the panel wanted Dr. Marmer to interview both of them.  (*E.g.*, Sullivan Aff. at ¶¶ 31, 33, 34.)  Dr. Marmer and a member of the Vernon Board of Education interviewed Messrs. Beirn and Hanelt on April 12, 2007; Dr. Marmer "liked both" applicants, and found both to possess "the necessary technical skills" as well as "the leadership and management abilities and experience to take the Department of Data Processing to the next level and not simply maintain the status quo of the department." (Marmer Aff. at ¶¶ 22–24.) She offered the job to Mr. Beirn on the basis of his "municipal experience" (Marmer Aff. at ¶ 24), and Mr. Beirn accepted (*see also* Ex. W (first offer); Ex. X (Mr. Beirn's negotiation letter); Ex. Y (second offer)).  The Town Council approved Dr. Marmer's recommendation on May 1, 2007.  (Clark Aff. at ¶ 55.)  Two weeks later, Mr. Sullivan reported to Mr. Clark the results of his conversations with Mr. Beirn's references.  (*See* Ex. AA.)

Ms. Pippin avers that she is "better qualified for the position" than either Mr. Beirn or Mr. Hanelt. (Pippin Aff. to CHRO, att. to Pl.'s Rule 56(a)2 Stmt. [Doc. # 25].) In support of this assertion she offers the testimony of Mr. DuPont. When Mr. Beirn was hired to be Director of Data Processing, Mr. DuPont, who remains employed in the Town's data processing department, filed a grievance under the union contract alleging that Mr. Beirn was not the best-qualified person to be Director and seeking an order revoking Mr. Beirn's offer of employment and offering the position to Ms. Pippin. (DuPont Dep., att. to Pl.'s Rule 56(a)2 Stmt., at 9:5–11, 11:6–14.) Mr. DuPont complains that Mr. Beirn "has no knowledge of the operations in the data center [and] doesn't have much knowledge of computers," such that "we still have problems with him not knowing things" (*id.* at 10:1–7), but that by contrast Ms. Pippin "knew the operation of the data center, the end users, [and] what their functions were," through which "[s]he was able to effectively remedy the problems" (*id.* at 11:23–25). Mr. DuPont testified that Mr. Beirn does not possess many of the skills or experiences listed on his application for employment (*see id.* at 15:2–21:22), suggesting that Mr. Beirn misrepresented himself to the interview panel and Dr. Marmer. Mr. DuPont also gave examples of what he took to be Mr. Beirn's poor managerial skills (*see id.* at 29:4–33:24) and lack of technical skills (*id.* at 36:13–37:25), and ways in which he believed Ms. Pippin would have managed the department better than Mr. Beirn has (*see id.* at 34:9–22). Mr. DuPont did compare Mr. Beirn's technical knowledge favorably to Ms. Pippin's. (*Id.* at 25:2–9.)

According to Ronald J. Masse, who supervised Mr. Beirn's work as consultant to the Town of Manchester, when Mr. Sullivan called him to discuss Mr. Beirn, they conducted "a short conversation," and Mr. Sullivan asked him only "'What are some of his talents?'," to which Mr. Masse responded "'He could be persuasive.'" Mr. Masse testified that Mr. Beirn's resume misrepresented many of his experiences and skills, which according to Mr. Masse were lesser than what the resume indicated. He further testified that Mr. Sullivan did not ask about Mr. Beirn's qualifications or "the accuracy of the[] claims" on Mr. Beirn's resume, but that if asked he would have told Mr. Sullivan about the inaccuracies. Mr. Masse's understanding was that by the time Mr. Sullivan called him, Mr. Beirn had already been hired. (Masse Dep., att. to Pl.'s Rule 56(a)2 Stmt., at 7:21–19, 9:2–10:13, 11:9–13:9; *compare* Sullivan Aff. at ¶ 41.)

II.   Standards

    A.   Summary Judgment

Summary judgment is appropriate where the record after discovery "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the burden of showing that [it] is entitled to summary judgment." *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The non-

moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant "need not prove a negative," but "need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." *Id.* (quotation omitted, second alteration in original). If the record as a whole, viewed in the light most favorable to the non-moving party, "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment should follow. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quotation marks omitted).

  B. Title VII

> A plaintiff alleging a violation of [Title VII] must establish, by a preponderance of the evidence, a prima facie case consisting of four elements: (1) that plaintiff falls within the protected group, (2) that plaintiff applied for a position for which he was qualified, (3) that plaintiff was subject to an adverse employment decision and (4) that the adverse employment decision was made under circumstances giving rise to an inference of unlawful discrimination. The burden upon the plaintiff to prove a prima facie case is minimal.
>
> Once a prima facie case has been established, the burden of production shifts to the employer who must defeat a rebuttable presumption of discrimination by articulating a legitimate, non-discriminatory reason for the employment

14

> decision. If the employer offers, via admissible evidence, a justification of its action which, if believed by a reasonable trier of fact, would allow a finding of no unlawful discrimination, then "'the *McDonnell Douglas* framework—with its presumptions and burdens'—disappear[s], and the sole remaining issue [is] 'discrimination *vel non*.'"
>
> At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer. A court is to examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" A motion for summary judgment may be defeated where "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."

*Byrnie v. Town of Cromwell*, 243 F.3d 93, 101–02 (2d Cir. 2001) (citations omitted).

III.  Discussion

The Court assumes that Plaintiff makes out a *prima facie* case under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). She (1) is a woman; (2) applied for the position of Director of Data Processing for the Town of Vernon; (3) was not hired to be the director; and (4) was qualified for the position for which a man was hired. *See Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) ("the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis").

In response, the Town produced evidence in support of, and "articulated[,] a legitimate business reason for not hiring [Ms. Pippin]: [Mr. Beirn] performed better than [Ms. Pippin] during the candidate interviews and thus seemed, based on subjective criteria,

15

the better qualified candidate." *Byrnie*, 243 F.3d at 102.  According to Messrs. Clark, Sullivan, and Luddecke, Ms. Pippin performed poorly during her interview and presented fewer qualifications than either Mr. Beirn or Mr. Hanelt.  According to the panelists Ms. Pippin's answers failed to demonstrate that she had thought about the future of the Data Processing Department; Mr. Beirn and Mr. Hanelt each appeared stronger to the panel than Ms. Pippin in the communication and managerial skills necessary to operate within the Town's administrative hierarchy.  Thus, "having fulfilled its role of forcing the defendant to come forward with some response," any inference of discrimination created by Plaintiff's *prima facie* case "simply drops out of the picture."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993).[4]

---

[4] In her Local Rule 56(a)2 Statement, Plaintiff stated that she "move[d] to strike" eight of Defendant's assertions in its Local Rule 56(a)1 Statement on the basis that "[s]ubjective beliefs are not a proper subject for a summary judgment motion."  (*See* Pl.'s Rule 56(a)2 Stmt. at ¶¶ 17, 18, 56–60, 69.)  Plaintiff did not file any motion to strike, however, and at oral argument agreed that her assertions were properly construed as objections.  Plaintiff also agreed that under Title VII "an employer can[] utilize subjective standards in making an evaluation" of job applicants, but argued that subjective standards "cannot be the basis for a motion for summary judgment" because "when subjective standards are relied upon there is no way that on paper a court can evaluate them" without making "credibility determinations" properly made "only by a jury."  (Oral Arg. Tr. at 4–5.)

The Court disagrees.  *Byrnie* clearly indicates that summary judgment may be granted to an employer using subjective criteria.  It held that "'[t]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview,'" so long as its "'explanation of its reasons [are] clear and specific,'" *Byrnie*, 243 F.3d at 104–05 (quoting the "proper[] note[]" of the district court and *Meiri v. Dacon*, 759 F.2d 989, 996–97 (2d Cir. 1985)), and denied summary judgment not because the criteria were subjective but because the employer's credibility was undercut by the plaintiff's clearly superior paper credentials.

Neither case on which Plaintiff relied in her Local Rule 56(a)2 Statement is to the

16

In arguing that the Town's legitimate nondiscriminatory reason for hiring Mr. Beirn is pretextual, Plaintiff asserts that Mr. Beirn's "resume was false" and that "[h]e was far less qualified and has botched the job." (Pl.'s Opp'n Summ. J. at 2.) Presumably relying on Mr. Masse's testimony, Plaintiff further asserts that the Town "did not check his references at all before offering him the job[] and when the references finally were checked no appropriate questions were asked," such that the Town "had no interest in checking out [Mr. Beirn's] background or qualifications." (*Id.* at 2, 13.) When arguing that a discrepancy in qualifications supports an inference of pretext, a plaintiff's burden is high:

> When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only

---

contrary, since both of them, like *Byrnie*, denied summary judgment on the basis of evidence—absent here—supporting an inference that the employer's stated rationale was pretextual. *See Medeiros v. Pratt & Whitney Power Systems, Inc.*, 272 F. App'x 78, 78–80 (2d Cir. 2008) (where employer stated that it terminated the plaintiff's employment as part of "its general efforts to cut costs due to deteriorating conditions for the energy industry in 2002 and the specific results of comparative assessment of" the plaintiff's group within the company, but the person performing the comparative assessment "did not 'familiarize himself with the individual educational backgrounds or prior work experiences of the employees he was ranking'" and his testimony regarding a meeting he had about the layoffs was contradicted by the person with whom he testified to meeting, summary judgment was inappropriate because "'[i]t is possible, though not obvious, . . . that [this evidence] . . . could persuade a reasonable jury to question as pretext [the employer's] explanation for Medeiros'[s] low ranking'"); *Ruscoe v. Housing Auth. of City of New Britain*, 259 F. Supp. 2d 160, 167–68 (D. Conn. 2003) (holding that the employer's stated subjective rationales—that the plaintiff did not "provide[] the best responses during the second round of interviewing" or "provide[] a long-term vision for the" employer—were "legitimate and nondiscriminatory" but were sufficiently undermined by plaintiff's evidence that the interview panelists had written notations that the plaintiff was "'old school'" and was "'sticking with the old guard'" to warrant presentation to a jury).

17

> conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."

*Byrnie*, 243 F.3d at 103 (quoting *Deines v. Tex. Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280–81 (5th Cir. 1999)); *see also id.* (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates")).

Plaintiff's proffered evidence does not support her claim. Even assuming, as the Court must at summary judgment, that Mr. Beirn's application did misrepresent his skills and experiences and that Mr. Beirn has done a sub-par job as Director, Plaintiff has proffered no evidence that at the time the Town made the decision Plaintiff challenges—that is, to hire Mr. Beirn—any Town employee predicted Mr. Beirn's sub-par performance or knew of the misrepresentations or intentionally avoided learning about them by not checking his references before offering him the position. In addition, Plaintiff proffers no evidence that the other applicants ranked above her, Mr. Hanelt and Mr. Pillar, misrepresented their qualifications. In light of the uncontested evidence of the greater managerial experience of each of the male applicants and their relatively strong interview performances, the fact that Plaintiff was the Acting Director of the Data Processing Department does not make her credentials "so superior to" the other applicants' credentials such that she was the only reasonable choice for the Town to hire as Director. Rather, according Plaintiff all favorable inferences possible, the most that can be inferred from the

18

record evidence is that notwithstanding the four ranked applicants' different constellations of strengths, they were similarly qualified.

Thus, the record evidence, taken in the light most favorable to Plaintiff, supports, *at best*, a conclusion that at the time it determined to hire Mr. Beirn, the Town was choosing from among a number of applicants, none of whose applications reflected qualifications far stronger than the others.[5] In this circumstance "'the court must respect the employer's unfettered discretion to choose among qualified candidates.'" *Byrnie*, 243 F.3d at 103 (quoting *Fischbach*, 86 F.3d at 1183 and citing *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999) ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.") (citation omitted)).

Plaintiff also proffers no evidence that undercuts the credibility of Messrs. Clark, Sullivan or Luddecke, or Dr. Marmer. *Cf. Byrnie*, 243 F.3d at 105 ("'[[W]]hile the business judgment rule protects the sincere employer against second-guessing of the reasonableness of its judgments, it does not protect the employer against attacks on its credibility.'") (citation omitted). The evidence that the interview panelists were not careful in confirming the accuracy of each applicant's resume cannot support an inference that the panelists' or Dr. Marmer's explanations for choosing Mr. Beirn lack credibility, and Plaintiff points to no "procedural irregularities" or "inconsistencies" in the Town's process of hiring Mr. Beirne

---

[5] Indeed, at oral argument Plaintiff agreed that she did not claim that she "had credentials so superior to the credentials of anyone else that nobody could disagree that she[ was] the most qualified" applicant. (Oral Arg. Tr. at 16.)

19

that would cast doubt upon the sincerity or veracity of the Town's stated legitimate nondiscriminatory rationale for choosing him. *See id.* (discussing factors that could undercut an employer's credibility). Plaintiff's proffer, even if it suggests that the Town's hiring practices were sloppy or not thorough, does not support any inference that the interview panelists' stated rationales for recommending Mr. Beirn to Dr. Marmer were pretextual.

Because Plaintiff does not proffer "sufficient evidence to find that the employer's asserted justification is false," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000), summary judgment must be granted to the Town.

IV.    Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment [Doc. # 22] is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of September, 2009.